AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black iPhone Xr Model Number MT2L2LL/A<br>Serial Number C8PXJ2YXKXKW<br>IMEI Nos. 357333092057581 and 357333092279615 | )<br>)<br>)   Case No.   **19MJ4288**<br>)<br>)<br>) |

FILED
OCT - 2 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952, 960, 963 | Importation of Methamphetamine, Conspiracy |

The application is based on these facts:
See attached affidavit of HSI Special Agent Michael R. Dang.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael R. Dang, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/2/19

*Judge's signature*

City and state: San Diego, California        Michael S. Berg, United States Magistrate Judge
*Printed name and title*

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period from July 22, 2019 through September 21, 2019:

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance, from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

Black iPhone Xr

Model Number MT2L2LL/A

Serial Number C8PXJ2YXKXKW

IMEI Nos. 357333092057581 and 357333092279615

Seized as FP&F No. 2019250400243701

("**Target Device**")

The **Target Device** is currently in the possession of Homeland Security Investigations and located at 2255 Niels Bohr Court, San Diego, CA 92154.





# AFFIDAVIT

I, Special Agent Michael R. Dang, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device:

> Black iPhone Xr
> Model Number MT2L2LL/A
> Serial Number C8PXJ2YXKXKW
> IMEI Nos. 357333092057581 and 357333092279615
> Seized as FP&F No. 2019250400243701
> (" **Target Device** ")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Section(s) 952, 960, and 963, as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Nishan Singh DHILLON ("DHILLON") for importing approximately 12.92 kilograms (28.48 pounds) of methamphetamine from Mexico into the United States. *See U.S. v. Dhillon*, Case No. 19-mj-4072-WVG (S.D. Cal.) at ECF No. 1 (Complaint). The **Target Device** was seized from the vehicle DHILLON was driving at the time of his arrest, has been securely stored since that time, and is currently located at 2255 Niels Bohr Court, San Diego, CA 92154.

3. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

///
///

1

## BACKGROUND

4. I am a Special Agent of the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI) and an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

5. I have been employed as a Special Agent with HSI since July 2018. I am currently assigned to the HSI office in San Ysidro, California. I am a graduate of the Criminal Investigator Training Program and HSI Special Agent Training Program at the Federal Law Enforcement Training Center, where I have received training in narcotics smuggling investigations. Prior to becoming a Special Agent with HSI, I was employed as a United States Border Patrol (USBP) Agent from September 2011 to July 2018, where I was assigned to the Casa Grande, Arizona area of operations. I have also worked with and consulted with numerous agents and law enforcement officers who have investigated drug trafficking cases. I am aware that drug traffickers often communicate with their criminal associates using telephones and cellular telephones, including pre-paid cellular phones and radios. I am aware that drug traffickers often change their telephones or telephone numbers in order to avoid detection by law enforcement. Based on review of previously intercepted wire communication, interviews with defendants that I have arrested, and conversations with other law enforcement officers, I am aware that persons discussing criminal matters over the phone often speak in code or vaguely, and I am aware of some common codes or methods of coding. This training and experience forms the basis for opinions expressed below.

6. Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. I am aware that it is common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones.

Because they are mobile, the use of cellular telephones permits narcotics traffickers to easily carry out various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in narcotics trafficking investigations, I am aware that individuals engaged in drug trafficking commonly store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in drug trafficking, as well as images and videos of drugs or contraband, proceeds and assets from drug trafficking, and communications to and from recruiters and organizers.

8. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance, from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

9. On September 20, 2019, at approximately 2:50 a.m., DHILLON applied for permission to enter the United States at the San Ysidro, California Port of Entry. DHILLON was the driver and sole occupant of a gray Honda Accord bearing California license plates. A Narcotics and Human Detection Dog ("NHDD") alerted to the exterior of the vehicle in pre-primary; when DHILLON complied with the request to open the trunk the NHDD alerted to the sending unit located in the trunk behind the rear seats. DHILLON then told a Customs and Border Protection ("CBP") Officer that the car belonged to friend, that he went to Mexico "to sleep" in a hotel that he could not remember the name of, and that he did not have anything to declare. DHILLON was removed from the vehicle. A Z-Portal x-ray scan indicated anomalies in the fuel tank of the vehicle, and a further examination revealed 25 vacuum-sealed packages in the fuel tank. The packages totaled 12.92 kilograms in weight, and one field-tested positive for the properties of methamphetamine.

10. DHILLON was advised of his *Miranda* rights and elected to answer questions without an attorney present. DHILLON denied knowledge of the methamphetamine that was seized from the vehicle but stated in part:

    a. He borrowed the vehicle from his neighbor, "Rick";

      b. He went to Mexico to sleep, rest, and "get some girls";

      c. He "met a guy" that said he could help DHILLON make some money;

      d. He met some people in Los Angeles—people he did not know and could not recall how they looked—that told him about an easy way to make money that involved driving a vehicle, parking it somewhere, getting a room, and then driving it back;

      e. He thought he was bringing drugs from the United States into Mexico, and that the vehicle was "empty" at the time of his arrest; and

      f. He anticipated being paid money, but did not know how much or when.

11. DHILLON also stated during his post-arrest interview that his iPhone was in the vehicle, and that it did not have a passcode but had a cracked back—a description that matches the **Target Device** that agents seized during a search of the vehicle. DHILLON provided consent to search the **Target Device**, but a forensic download was not completed prior to the appointment of DHILLON's attorney, who has since withdrawn DHILLON's consent to search. However, prior to the revocation of consent, agents accessed and took photographs of the **Target Device**.[1] The photographs include those in Attachment A and the following, which indicates the **Target Device** belongs to DHILLON:

---

[1] Other than the four photographs and unique identifying information of the **Target Device** contained therein, nothing obtained during the prior search is included in this affidavit or attachments thereto. Nevertheless, the Government, in an abundance of caution, asks the Court not to consider information agents may or may not have seen during the examination of the **Target Device** in determining whether there is probable cause for the requested warrants.



12. Based upon my experience and investigation in this case, I believe that the **Target Device** contains evidence of violations of Title 21, United States Code, Sections 952, 960, and 963. Specifically, I believe that DHILLON and other persons as yet unknown, were involved in an ongoing conspiracy to import methamphetamine or other federally controlled substances into the United States. Based on my experience investigating narcotics smugglers, I also believe that DHILLON may have used the **Target Device** to coordinate with co-conspirators regarding the importation and distribution of controlled substances, and to otherwise further this conspiracy both inside and outside of the United States.

13. In my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an

event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. In light of the nonsensical statements DHILLON made both before his arrest (e.g., that he went to Mexico "to sleep" at a hotel he could not remember the name of yet was entering the United States at 2:50 a.m.) and afterwards (e.g., that he thought he had delivered drugs from the United States into Mexico), I respectfully request permission to search the **Target Device** for data from July 22, 2019 through September 21, 2019, which was the day following DHILLON's arrest.

## METHODOLOGY

14. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic

data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

15. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

16. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

17. Other than as previously set forth herein, law enforcement has not attempted to obtain the evidence sought by this warrant.

**CONCLUSION**

18. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of DHILLON's violations of Title 21, United States Code, Sections 952, 960, and 963.

19. Because the **Target Device** was seized at the time of DHILLON's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from July 22, 2019 through September 21, 2019.

///
///
///
///

8

20. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Michael R. Dang
Homeland Security Investigations

Subscribed and sworn to before me this 2nd day of October, 2019.

_____
Hon. Michael S. Berg
United States Magistrate Judge

9